IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CV-345-D

YVONNE LEWIS HOLLEY,              )
                                 )
                Plaintiff,       )
                                 )
        v.                       )               **ORDER**
                                 )
NORTH CAROLINA DEPARTMENT         )
OF ADMINISTRATION, STATE OF       )
NORTH CAROLINA,                   )
                                 )
                Defendant.       )

Yvonne Lewis Holley ("Holley" or "plaintiff") is an African-American woman who is upset that she was not promoted to State Purchasing Administrator ("SPA") in October 2006. On June 15, 2009, Holley filed a complaint in Wake County Superior Court against the North Carolina Department of Administration ("NCDOA" or "defendant") alleging race and gender discrimination and retaliation. [D.E. 1], Ex. 2 ("Compl."). On July 31, 2009, the NCDOA removed the case to this court. [D.E. 1], Ex. 3. On January 11, 2010, Holley filed an amended complaint. Am. Compl. [D.E. 17]. Thereafter, the NCDOA moved to dismiss the amended complaint. [D.E. 18]. The court granted the NCDOA's motion to dismiss counts IV and V of the amended complaint for failure to state a claim upon which relief can be granted, but denied the motion as to counts I–III. [D.E. 30]. In her remaining claims, Holley seeks relief under Title VII of the Civil Rights Act of 1964 ("Title VII") for race discrimination (count I), gender discrimination (count II), and retaliation (count III). Am. Compl. ¶¶ 38–55. On May 23, 2011, the NCDOA moved for summary judgment [D.E. 41], and filed a supporting memorandum [D.E. 42]. On July 8, 2011, Holley responded in opposition. Pl.'s Mem. Opp'n [D.E. 49]. On July 25, 2011, the NCDOA replied. Def.'s Reply [D.E. 55]. As explained below, the court grants defendant's motion for summary judgment.

I.

A.

Holley holds a political science degree from Howard University. Holley Dep. I [D.E. 52] 20. In January 1987, Holley began her career as a State Procurement Specialist in the NCDOA's Division of Purchase and Contract ("P&C"). See [D.E. 50], Ex. 10 ("Holley Aff.") ¶ 3. She has since received one upgrade and one promotion. Holley Dep. I 59. Holley now works as a Procurement Specialist III in P&C. Am. Compl. ¶ 9; Answer [D.E. 2] ¶ 9; see Holley Dep. I 59. During her twenty-four years at P&C, Holley has specialized primarily in purchasing medical and scientific equipment. See Holley Dep. I 85. She has had some experience with service contracts, but she could not recall how much. Id. 83. She has handled some maintenance-related service contracts, but otherwise could not recall what types of service contracts she has handled. Id.

Holley has never formally been a supervisor at P&C. However, Holley claims that, early in her career at P&C, she was left in charge of her office's staff for about two hours every morning because her boss "didn't come to work until . . . nine-thirty . . . in the morning and the majority of the staff was [there] by seven-thirty." Holley Dep. III [D.E. 54] 247. During these two hours, Holley "was the person . . . [the staff members] were to come to if they had any questions, if they needed any assistance, [or] if the managers were called up to the front for a meeting . . . ." Id. Specifically, Holley "would . . . keep up if somebody said they had to leave early or something, but [she] didn't put that in . . . any system." Id. 248. She likewise did not draft or submit any performance evaluations. Id. Holley also trained two new employees. Id. 247. Finally, Holley generally considered herself "a manager because of [her expertise in] scientific and medical equipment and [because of] the people in the field who . . . did not have that expertise and relied on [her] very heavily." Id. 252.

In addition to her P&C experience, Holley tried to gain supervisory experience through non-P&C activities. In particular, Holley once worked as a lifeguard-pool manager, where she "managed

2

from 25 to 30 people . . . in the summertime . . . ." Id. She also managed a program for girls at the YWCA. Id.

On March 1, 2006, the NCDOA adopted an Equal Employment Opportunity ("EEO") plan. Def.'s Mem. Supp. Mot. Summ. J. [D.E. 42], Ex. 5 ("EEO Plan"). The plan "ensure[s] greater utilization of all persons by identifying the underutilized groups based upon their representation in the workforce and making special efforts to increase their participation in recruitment, selection, training and development . . . ." Id. 4. As for P&C, the plan identified underutilization of African-American females and established a 2006 Target Classification with the goal of hiring an African-American female as a SPA. See id. 21; [D.E. 50], Ex. 5 ("Chavis Dep.") 16, 101–02. The plan, however, did not mandate hiring an African-American female. Def.'s Mem. Supp. Mot. Summ. J., Ex. 10 ("Robinson Aff.") ¶ 8; Chavis Dep. 102.

In July 2006, P&C posted a job announcement for a SPA position. Def.'s Mem. Supp. Mot. Summ. J., Ex. 3 ("SPA Job Posting"). The corresponding job description described the position as "an administrative and management [one] that functions as the Purchasing Manager that oversees Purchasing Group 2," a purchasing group responsible for diverse contract types—including contractual and consultant service contracts, commodities contracts, and term contracts, Def.'s Mem. Supp. Mot. Summ. J. 5—and a diverse clientele—including state agencies, community colleges, and universities. SPA Job Posting 2. More specifically,

> [t]his position directs and supervises the activities and operations of this purchasing group consisting of six purchasers and one support person in performance of statutory duties, which involves oversight of contracts valued at millions of dollars . . . . Develops relationships that extend the group's ability to reach more customers, provides proper guidance and direction to assigned staff, and implements processes that will develop and enhance procurement competencies within the group. . . . As a manager, this position is responsible for the development and administration of work plans to meet unit objectives, coaching and counseling of employees, and proper reporting of group activities and achievements. . . . The employee in this position plans, prioritizes, and prescribes the group's processes needed to achieve objectives . . . .

Id. To ensure selection of an individual who can fulfill these myriad responsibilities, the job

3

description sets forth several requirements. The position requires, at minimum, "[g]raduation from a four-year college or university and five years of experience in large-scale purchasing; or an equivalent combination of training and experience." Id. 3. Any successful applicant must also have "[k]nowledge of large scale purchasing methods and procedures . . . [and an a]bility to supervise and manage people through planning, interaction management, problem solving, goal setting and leadership." Id. 2. Furthermore, the SPA must be "able to interact well and establish effective working relationships with associates, officials and vendors," and must have "well-developed interpersonal, communication, managerial, [and] organizational . . . skills." Id. 2–3.

Twenty-seven individuals applied for the SPA position. [D.E. 51], Ex. 1 ("Screened Applicants List"). Of those twenty-seven applicants, the NCDOA deemed eight to be highly qualified. Id. Of the eight, four were Caucasian males, two were African-American females, one was an African-American male, and one was a Caucasian female. See Am. Compl. ¶ 34; Answer ¶ 34. The highly qualified applicant pool included Holley and Tim Lassiter ("Lassiter") (Caucasian male). See Screened Applicants List.

Lassiter studied architectural technology for two and one-half years at a community college. See [D.E. 51], Ex. 4 ("Lassiter Dep.") 12. He did not complete his degree, id., but when he applied for the SPA position, he had 150 months of qualifying experience above the minimum education and experience requirements. Part of that experience was outside P&C. Lassiter began his state purchasing career in 1986 as a Purchasing Agent II in the Purchasing Department at the University of North Carolina at Chapel Hill ("UNC"). Def.'s Mem. Supp. Mot. Summ. J., Ex. 13 ("Lassiter Aff.") ¶ 2. Between 1988 and 1992, Lassiter managed a procurement office at the North Carolina State University ("N.C. State") School of Veterinary Medicine that "handled all of the purchasing for goods and services for the College of Veterinary Medicine." Lassiter Dep. 20. Immediately thereafter, Lassiter spent three years as an information technology buyer for N.C. State before beginning a four- or five-year stint as manager of the Office of Purchasing for a physical plant at

4

N.C. State. Id. 20–22. In that latter position, Lassiter "handled services as well as everything for the physical plant and [information technology] equipment . . . ." Id. 22. Overall, Lassiter's experience with commodities contracts included "scientific commodities, chemicals, hospital supplies and equipment, and [information technology] equipment." Lassiter Aff. ¶ 2. As for services contracts, Lassiter had worked with "environmental cleanup, janitorial supplies, landscape services, hazardous waste material management, blood borne pathogen services, facilities . . . [and] all of the building maintenance facility services for the [N.C. State] Centennial Campus." Lassiter Dep. 22; see also Lassiter Aff. ¶ 2. In 1999, P&C hired Lassiter as a service purchaser and community college liaison. Lassiter Aff. ¶¶ 3–4. When he applied for the SPA position, Lassiter had six years and eight months of experience working for P&C. [D.E. 51].

In addition to this diverse purchasing experience, Lassiter had substantial, relevant supervisory experience.[1] Lassiter supervised two people while managing the procurement office at the N.C. State School of Veterinary Medicine for four years. Lassiter Dep. 20. Afterward, Lassiter managed the Office of Purchasing for a physical plant at N.C. State, where he worked for four or five years and managed a team of three purchasers. Id. 21–22. All told, Lassiter had nineteen years and six months of experience directly related to the SPA position. See [D.E. 51].

To evaluate Lassiter, Holley, and the other six highly qualified applicants, the NCDOA established an interview panel composed of James Westbrook ("Westbrook") (Caucasian male), James Staton ("Staton") (African-American male), David Womble ("Womble") (Caucasian male), and Barbara Stone-Newton ("Stone-Newton") (Caucasian female). Am. Compl. ¶ 15; Answer ¶ 15; Holley Aff. ¶ 19. The four panelists had over twenty years of purchasing experience and ten or more

---

[1] There is an immaterial discrepancy over how many years of supervisory experience Lassiter had when he applied for the SPA position. His deposition indicates approximately eight years. See Lassiter Dep. 20–22. A spreadsheet listing the experiences of several of the highly qualified applicants indicates six years and eight months' experience. [D.E. 51]. The court uses the shorter figure.

years of supervisory experience in purchasing. See, e.g., Def.'s Mem. Supp. Mot. Summ. J., Ex. 11 ("Stone-Newton Aff. I") ¶ 2; id., Ex. 12 ¶ 2; Def.'s Reply, Ex. 1 ("Stone-Newton Aff. II") ¶¶ 2–3. In addition to being an interview panelist, Stone-Newton was the hiring manager for the SPA position. Stone-Newton Aff. I ¶ 3; Chavis Dep. 83. Stone-Newton developed the interview questions from a template that the NCDOA provided. Stone-Newton Aff. II ¶ 6. She then sent the questions to the Division of Human Resources Management ("Human Resources") for approval. See id. The three other interview panelists were not involved in writing the questions and did not have access to the questions before the interviews. Id. ¶ 7. The interview was structured. See Holley Dep. I 75; cf. Def.'s Mem. Supp. Mot. Summ. J., Ex. 4 ("Merit Based Recruitment Plan") 11–12 (describing the structured interview process); Stone-Newton Aff. I ¶ 4. As part of the structured interview process, the panelists received complete work histories from each applicant and all applicants answered the same questions. See Stone-Newton Aff. II ¶¶ 8–9.

The interviews began on August 25, 2006 and concluded on September 1, 2006. See Screened Applicants List; cf. Am. Compl. ¶ 15; Answer ¶ 15. At the end of the interview process, Stone-Newton asked all interview panelists to rank the applicants. All panelists ranked Lassiter first and an African-American male candidate, Karl Sanders ("Sanders"), second. Stone-Newton Aff. II ¶ 13; see also Screened Applicants List.[2] The panel believed Lassiter

> was the most qualified person for [the] SPA position . . . because: (1) he had a much wider range of purchasing experience within the state procurement system; (2) he had direct supervisory experience and training that [Holley] lacked in purchasing, including being a Certified Professional Public Buyer; (3) and his performance before the Interview Panel was superior to that of [Holley] and all of the other applicants.

Stone-Newton Aff. I ¶ 5. Accordingly, on September 8, 2006, Stone-Newton, acting as hiring manager, recommended that P&C hire Lassiter for the SPA position. See Chavis Dep. 83; [D.E. 51],

_____

[2] The third-ranked candidate was Mildred Christmas (African-American female). Chavis Dep. 90. Out of a pool of eight, then, Holley could not have been any higher than the fourth-ranked candidate.

6

Ex. 7.

Pursuant to the EEO plan, the NCDOA established sign-off procedures to be followed when a candidate is recommended for promotion. See EEO Plan 28. After a hiring manager recommends a candidate, an information packet is first submitted to the Recruitment Office within Human Resources to review for documentation before going to salary administration to set salary. Chavis Dep. 12–13. Next, the packet is forwarded to the EEO officer for review before going to the Office of the Secretary of the Department of Administration. See Robinson Aff. ¶ 10; Chavis Dep. 12–13.

The EEO review is exactly that: a review. See Merit Based Recruitment Plan 6. When a hiring packet arrives, the EEO officer "will [first] look through [it] . . . ." Chavis Dep. 11. If the applicable EEO plan states a goal of hiring a member of an underutilized group for the position, the EEO officer "will verify" that the objective was considered and will determine whether a member of an identified underutilized group was ultimately selected. Id. If the goal was not fulfilled, the EEO officer will inquire as to "the reason why" a member of an identified underutilized group was not selected. Id. At that point, the EEO review will be complete and the EEO officer will sign off on the hiring packet. Id. 11, 69, 112. The signature represents only that the EEO review was completed. See id. 69, 112. The EEO officer will sign off on a hiring packet whether or not she agrees with the hiring packet. Id. 112. The EEO officer performs an advisory role only. See id. 97–98. The EEO officer has no approval authority or veto power. See EEO Plan 7, 10–12, 26, 28; Chavis Dep. 11, 24–25, 32, 112; [D.E. 51], Ex. 3 ("Robinson Dep.") 27, 40–41.

After the EEO officer completes her review, the NCDOA Secretary will review the recommendation and decide whether to approve it. The Secretary is free to approve a proposed hiring decision regardless of the EEO officer's concerns. See Chavis Dep. 107. The Secretary retains ultimate approval authority. Id. 11, 32, 107.

In this case, the NCDOA did not precisely follow the prescribed procedure. After Lassiter's proposed salary had been determined, Recruitment Officer Robert Schultz ("Schultz") (Caucasian

7

male), who was a new employee, mistakenly sent the information packet to NCDOA Secretary Britt Cobb ("Secretary Cobb") (Caucasian male) before the packet had undergone EEO review. Secretary Cobb had ultimate approval authority. On September 14, 2006, Secretary Cobb reviewed the hiring packet and approved Lassiter's promotion. Am. Compl. ¶ 25; Answer ¶ 25; cf. Robinson Aff. ¶ 10; Chavis Dep. 18, 69. When Secretary Cobb did so, EEO Officer Sondra Chavis ("Chavis") (African-American female) had not yet reviewed the packet. Robinson Aff. ¶ 10; Chavis Dep. 18, 69. By September 19, 2006, P&C had offered the promotion to Lassiter with an effective date of October 1, 2006, and Lassiter had accepted. See Am. Compl. ¶ 4; Answer ¶ 4. Shortly thereafter, Holley approached Chavis with a grievance. Only then did Chavis learn that Secretary Cobb had approved Lassiter's promotion before Chavis had reviewed the packet. See Chavis Dep. 18–19.

Once Human Resources discovered its mistake, it sent the packet to Chavis for EEO review. See id. 69–73. When the packet arrived, Human Resources Director Valerie Ford Robinson ("Robinson") (African-American female) asked Chavis "to go ahead and sign it." Id. 70. Chavis raised a procedural concern about the manner in which Lassiter's promotion had been approved. See, e.g., id. 16–20, 69–73, 78–79. Nonetheless, nobody tried to force Chavis to change her position or fail to conduct an EEO review, see id. 21, 72–73, and Chavis never felt that anyone "was trying to be deceitful" by asking for the EEO review after Secretary Cobb had already approved the promotion. Id. 72–73. On September 20, 2006, Chavis completed the EEO review and signed off on Lassiter's promotion. Id. 69–70. Once Chavis completed the EEO review, the NCDOA was in compliance with the EEO plan regarding Lassiter's promotion. Robinson Aff. ¶ 11. Secretary Cobb did not change the promotion decision, and Lassiter was promoted on October 1, 2006. Am. Compl. ¶ 21; Answer ¶ 21.

B.

Since joining P&C, Holley has applied for three promotions. See generally Holley Dep. II [D.E. 53] 128, 133. The first was the SPA position filled by Staton (African-American male) in

8

2004. Holley Dep. I 99–100. Holley felt that she deserved that job. Her conviction was so strong that, when Staton arrived for his interview, Holley "met him outside" the interview room and "told him . . . that [the position] was [her] job and [she] wanted it." Id. 100. When asked why she thought Staton was selected instead of her, Holley cited "his political connections." Holley Dep. II 130. According to Holley, when Staton was hired, Staton was dating Johnnetta Cole ("Cole"), then-president of Bennett College, a historically African-American college in Greensboro, North Carolina. Id. 131. According to Holley, Cole's "political collection [sic] [reflected] her long-standing respect and advocacy for education." Id.

The second promotion for which Holley applied was the SPA position filled by Westbrook (Caucasian male) in 2005. Id. 127. Holley again believed that she deserved the position. She had "been in [her current] position for 20 years waiting for [P&C] to open up" a managerial position. Id. 131. She "didn't leave and take a lesser paying job to get [recent] management experience . . . ." Id. 131–32.[3] She felt that her demonstrated loyalty entitled her to the SPA position. But in the end, the NCDOA selected a candidate with recent managerial experience. See id. Westbrook had it; Holley did not. See id. The NCDOA chose Westbrook. Holley "felt like that was a [sic] discrimination within itself." Id. 132.

Finally, Holley applied for and did not receive the SPA position at issue in this case. Id. 128. Once more, Holley believed that she deserved the position over Lassiter and all other candidates. Once more, the hiring committee, the hiring manager, and Secretary Cobb believed otherwise.

Unhappy that she was not promoted to the SPA position, Holley filed a discrimination complaint with the North Carolina Office of Administrative Hearings, Civil Rights Division ("CRD") on October 18, 2006. Am. Compl. ¶ 4; Answer ¶ 4. The CRD is a fair employment practices ("FEP") agency under Title VII and has jurisdiction to consider claims of race

---

[3] Holley asserted that she "had management experience but [the hiring committee] didn't . . . count it because it wasn't recent." Holley Dep. II 132.

9

discrimination, gender discrimination, and retaliation under Title VII. See 42 U.S.C. § 2000e-5(e)(1); 29 C.F.R. § 1601.74; Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 538–41, 543 (E.D.N.C. 2008). On February 13, 2008, the CRD issued a Notice of Cause Determination finding that Holley had failed to establish cause for her gender discrimination claim, but had established cause for her race and race-sex discrimination claims. See [D.E. 50], Ex. 3 ("Notice of Cause Determination") 19. On April 13, 2009, the United States Department of Justice issued a Notice of Right to Sue. Compl., Ex. B. Thereafter, Holley filed suit.

After complaining about her October 2006 non-promotion and filing her discrimination charge, Holley continued to receive positive performance evaluations. See generally Def.'s Mem. Supp. Mot. Summ. J., Ex. 15 ("Performance Evaluations"). Nevertheless, Holley claims that she experienced adverse treatment in retaliation for her discrimination charge. See generally Holley Dep. II 101–20. One alleged retaliatory incident involved Holley's attempt to purchase DNA-testing equipment for the North Carolina State Bureau of Investigation ("SBI") and the length of time it took for the Board of Award—a body charged with approving certain state purchasing contracts—to approve the purchase. Id. 103–04; Def.'s Reply, Ex. 2 ("Staton Dep. III") 62. In addition, Holley asserts that she received "a lot of scrutiny with [her] Board sheets . . . ." Holley Dep. II 105. Finally, Holley complains that the NCDOA intentionally held open some vacant lateral positions to deny Holley employment opportunities. See generally id. 113–14.

Holley's amended complaint includes five claims against the NCDOA. Am. Compl. ¶¶ 38–67. Of those five claims, only counts I–III remain. See [D.E. 30]. In count I, Holley alleges that the NCDOA failed to promote her in October 2006 due to her race in violation of Title VII. Am. Compl. ¶¶ 38–43. In count II, Holley alleges that the NCDOA failed to promote her in October 2006 due to her gender in violation of Title VII. Id. ¶¶ 44–50. In count III, Holley alleges that the NCDOA retaliated against her due to her complaint about her non-promotion in October 2006 in violation of Title VII. Id. ¶¶ 51–55.

10

II.

In considering the motion for summary judgment, the court views the evidence in the light most favorable to plaintiff and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. In evaluating affidavits submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence (such as hearsay) described in such affidavits. See Fed. R. Civ. P. 56(c); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

Title VII prohibits employers from "fail[ing] or refus[ing] to hire . . . any individual, or otherwise to discriminate against any individual . . . because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish such a violation of Title VII in two ways.

First, a plaintiff may demonstrate through direct evidence that illegal discrimination motivated an employer's adverse employment action. If a plaintiff does not have any direct evidence of illegal discrimination, the plaintiff may proceed under the burden-shifting pretext framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See generally Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc). Here, Holley pursues both avenues. See Pl.'s Mem. Opp'n 8–11.

Direct evidence is evidence from which no inference is required. To show race or gender discrimination by direct evidence, a plaintiff typically must show discriminatory motivation on the part of the decisionmaker involved in the adverse employment action. See generally Hill, 354 F.3d at 286–91. Such direct evidence would include a decisionmaker's statement that he did not promote a plaintiff due to her race or gender. The decisionmaker must be either the employer's formal decisionmaker or a subordinate who was "principally responsible for," or "the actual decisionmaker behind," the allegedly discriminatory action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151–52 (2000). Nevertheless, courts should not quickly attribute "to any ultimate decision maker . . . the most unfortunate expressions and beliefs of those around him . . . ." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir. 2010). "[T]hat any distasteful comments will arise in the workplace" is regrettable. Id. "[B]ut that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." Id.

A.

First, Holley argues that discriminatory remarks that a non-decisionmaker named Mike Mangum ("Mangum") (Caucasian male) made as a young child are direct evidence of race discrimination in connection with her October 2006 non-promotion. Pl.'s Mem. Opp'n 10. Specifically, during Mangum's deposition, Holley's attorney asked Mangum if he had ever used the

12

word "nigger." Mangum (who is now well past middle-aged and who served as the P&C Division Director in October 2006)[4] testified that he had used the word as a young child, but not since that time. See [D.E. 51], Ex. 2 ("Mangum Dep. I"), 9–10.

Holley's argument fails. Mangum's comments as a young child are not direct evidence of race discrimination in connection with the October 2006 decision at issue in this case. Under Reeves, Mangum was not the decisionmaker nor principally responsible for the decision to promote Lassiter. As mentioned, the interview panel was comprised of Stone-Newton, Westbrook, Staton, and Womble. Holley Aff. ¶ 19. Stone-Newton also functioned as the hiring manager for the SPA position. Stone-Newton Aff. I ¶ 3. In addition, Robert Schultz was the Recruitment Officer, Sondra Chavis was the EEO Officer, and Britt Cobb was the Secretary of the NCDOA. Simply put, Mangum was not the de jure or de facto decisionmaker. Furthermore, it is regrettable that Mangum uttered a racial slur as a young child, but Mangum's conduct as a young child is too remote to constitute direct evidence of race discrimination in this case. Accordingly, Holley lacks direct evidence of race discrimination in connection with her October 2006 non-promotion.

## B.

Even without direct evidence of race- or gender-based discrimination, a plaintiff's Title VII claim can survive summary judgment if the plaintiff raises a genuine issue of material fact under the burden-shifting framework established in McDonnell Douglas. Under this analysis, the plaintiff must first establish a prima facie case of discrimination. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the defendant took the adverse employment action "for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254. If the defendant offers admissible evidence sufficient to meet its burden

---

[4] Mangum has since retired, and Staton was promoted to succeed Mangum as the P&C Division Director. See Holley Dep. I 52; Chavis Dep. 23.

13

of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves, 530 U.S. at 143; Burdine, 450 U.S. at 256; King v. Rumsfeld, 328 F.3d 145, 151 (4th Cir. 2003).

To establish a prima facie case of failure to promote based on race or sex, a plaintiff must show (1) that she belongs to a protected class; (2) that she applied for the position at issue; (3) that she was qualified for that job; and, (4) that the defendant rejected her application under circumstances supporting an inference of unlawful discrimination. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 n.6 (4th Cir. 2005). One way for an African-American female to prove the fourth element is by showing that the employer rejected her application for promotion and filled the job with a Caucasian male. See Miles v. Dell, Inc., 429 F.3d 480, 485–86 (4th Cir. 2005); Brown v. McLean, 159 F.3d 898, 905 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).

Holley has established a prima facie case; therefore, the NCDOA must provide a legitimate, non-discriminatory reason for promoting Lassiter over Holley. A defendant's burden of providing a legitimate, non-discriminatory reason is one of production, not persuasion. St. Mary's Honor Ctr., 509 U.S. at 509. A defendant must present its legitimate, non-discriminatory reason "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Burdine, 450 U.S. at 255–56. For example, an employer's good faith belief that another candidate is better qualified due to that employee's job performance and experience is a legitimate, non-discriminatory reason for an adverse employment decision. Evans, 80 F.3d at 960 ("Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision.").

The NCDOA contends that "there are numerous legitimate, non-discriminatory reasons why Mr. Lassiter, and not [Holley], was . . . selected . . . ." Def.'s Mem. Supp. Mot. Summ. J. 19. First,

14

Lassiter had broader purchasing experience. Id. Second, Lassiter had more and better supervisory experience and training. Id. Third, Lassiter performed better in his interview. Id. These are all legitimate, non-discriminatory reasons for promoting Lassiter and not Holley. See Evans, 80 F.3d at 960. Accordingly, the NCDOA has met its burden of production and the burden shifts back to Holley to demonstrate that the NCDOA's justification is pretextual.

A plaintiff can demonstrate pretext by showing that the alleged non-discriminatory "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [race- or gender-based] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted). In conducting this analysis, the court does not sit to decide whether the defendant in fact discriminated against the plaintiff on the basis of race or gender. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. Pepsico, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000). Rather, the issue is whether plaintiff has raised a genuine issue of material fact as to pretext within the meaning of Reeves and its Fourth Circuit progeny.

In asserting that the NCDOA's justifications for promoting Lassiter are pretextual, Holley makes five arguments. Pl.'s Mem. Opp'n 15–28. The court addresses each in turn.

1.

First, Holley argues that the NCDOA failed to follow its EEO plan. Pl.'s Mem. Opp'n 15–21. Failure to follow affirmative action plans—like the NCDOA's EEO plan—can be evidence of pretext. See, e.g., Antol v. Perry, 82 F.3d 1291, 1303 (3d Cir. 1996); Mozee v. Am. Commercial Marine Serv. Co., 940 F.2d 1036, 1051 (7th Cir. 1991); Craik v. Minn. State Univ. Bd., 731 F.2d 465, 472 (8th Cir. 1984). Nevertheless, an employer's selection process need not be perfect, so long as the evidence, viewed as a whole, demonstrates that the process "was not administered in a discriminatory manner." Love v. Alamance Cnty. Bd. of Educ., 757 F.2d 1504, 1509–10 (4th Cir. 1985).

15

Holley argues that the NCDOA EEO plan included a 2006 Target Classification goal of hiring one African-American female for a SPA position in P&C. Pl.'s Mem. Opp'n 16. Although the NCDOA was aware of the goal, Holley argues that the NCDOA failed to consider this goal during the hiring process at issue. Id. Holley also argues that the NCDOA failed to follow proper hiring procedures. Specifically, Holley argues that the NCDOA "failed to vet its selection of Lassiter with EEO Officer Chavis prior to forwarding the selection to the Secretary's Office." Id. 17. According to Holley, this conduct evinces pretext designed to mask race and gender discrimination. Id. Holley offers three additional pieces of evidence to supplement this conclusion: (1) before the interviews, Womble and Lassiter asked Sanders if he had applied for the SPA position, and thereby attempted to gather information about Sanders to develop interview questions and modify the criteria on which the applicants would be considered; (2) Mangum encouraged Lassiter to apply for the SPA position; and, (3) P&C had a pervasive culture hostile to African-American employees. Id. 18–19.

As for whether the NCDOA failed to consider the 2006 Target Classification goal during the hiring process, Stone-Newton and Staton both testified that they did not consult the EEO hiring plan before recommending Lassiter. [D.E. 51], Ex. 8 ("Staton Dep. II") 83; [D.E. 51], Ex. 11 ("Stone-Newton Dep.") 23. However, they did not comment on whether they were aware of the goal or whether they considered it during the hiring process for the SPA position. See Staton Dep. II 83; Stone-Newton Dep. 23. Moreover, Secretary Cobb was aware of the goal, yet approved Lassiter's promotion. See Chavis Dep. 74–75.[5] Furthermore, the hiring process provided a diverse group of eight highly qualified applicants who were given every consideration as required by the NCDOA's EEO plan. The final eight included four Caucasian males, two African-American females, one

_____

[5] Holley also cites Womble's deposition to support the proposition that the NCDOA did not consider the goal during the hiring process. Pl.'s Mem. Opp'n 16. Womble's deposition, however, does not even mention the goal. Rather, plaintiff's attorney asked Womble whether, "[i]n 2006, [Womble was] familiar with the policies of the Department of Administration *with regard to processing interview packages* before they went to the Secretary of Administration." [D.E. 51], Ex. 10 ("Womble Dep.") 18 (emphasis added). Unremarkably, Womble replied, "No." Id.

African-American male, and one Caucasian female. That the NCDOA ultimately hired a Caucasian male is immaterial; the 2006 Target Classification set an aspirational goal and did not mandate hiring an African-American female. Thus, the record does not show that the NCDOA failed to consider the goal during the hiring process.

As for the mistake concerning the EEO review, the NCDOA acknowledged the mistake that Human Resources made in failing to send the promotion recommendation to Chavis before sending it to Secretary Cobb, but has consistently maintained that this procedural error was merely an oversight. Id. 14 ("I had asked the recruiter and I believe he stated it was an oversight . . . ."); id. 19 (noting that the recruiter, Schultz, "sa[id], oh, it was an oversight"); id. 99 (noting that "the process that was not followed happened in the HR office. . . . I do not have any reason to substantiate that that came from management. . . . [T]he process actually failed in the HR office."); see also Def.'s Mem. Supp. Mot. Summ. J., Ex. 14 ("Chavis Aff.") ¶ 9 ("The fact that I did not review the hiring package for SPA position #6709 before Secretary Britt Cobb approved it was an oversight."). Once the NCDOA discovered the mistake, it was quickly remedied, and Chavis completed her EEO review of Lassiter's promotion. See Chavis Dep. 69–73. Moreover, Lassiter's promotion did not take effect until October 1, 2006, which was ten days after Chavis completed her EEO review. Procedurally, the NCDOA erred; substantively, the error was immaterial and not probative of race or gender discrimination. See, e.g., DAG Petroleum Suppliers, L.L.C. v. BP P.L.C., 268 F. App'x 236, 242 (4th Cir. 2008) (per curiam) (unpublished) (holding that "[p]retext is a lie or cover-up, not merely a mistake," and that "[t]herefore, evidence that [an employer] erroneously or even purposely misapplied [its own] policy, will not suffice to overcome summary judgment" (quotations omitted) (first and third alterations in original)); Snik v. Verizon Wireless, 160 F. App'x 191, 194 (3d Cir. 2005) (unpublished) (holding that a failure to follow proper procedures because of a mistake corrected soon after it was identified is not evidence of pretext); Cardoso v. Robert Bosch Corp., 427 F.3d 429, 435 (7th Cir. 2005) (holding that pretext is "a lie or deceit designed to cover one's tracks,"

not merely a business error); Dugan v. Albemarle Cnty. Sch. Bd., 293 F.3d 716, 722 (4th Cir. 2002) ("[E]vidence that the school board erroneously or even purposely misapplied [applicable reduction-in-workforce policies and procedures], . . . is not proof of unlawful discrimination."); Vaughan v. Metrahealth Cos., Inc., 145 F.3d 197, 203 (4th Cir. 1998) ("The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent." (quotation omitted) (emphasis in original)), overruled on other grounds by Reeves, 530 U.S. 133.

Arguing to the contrary, Holley relies heavily on Chavis's testimony. See Pl.'s Mem. Opp'n 17. Holley asserts that Chavis testified to her concern that the NCDOA intentionally skipped the EEO review in order to hire a Caucasian male without considering Chavis's reservations. Id. However, Holley has quoted Chavis's deposition very selectively in reaching this conclusion. When speculating[6] on why the hiring process was not followed correctly, Chavis first testified that "maybe it was a time crunch . . . ." Chavis Dep. 14. Alternatively, Chavis speculated that perhaps it was "because [Lassiter] was an internal candidate . . . [and] maybe the recruiter did not feel that it was that important, that it may have been just a sign-off." Id. At bottom, Chavis really just did not know. Id. A few questions later, Holley's attorney returned to the issue, this time asking specifically whether Chavis felt "as though the fact that Tim Lassiter was a white male had anything to do with the EEO process being skipped . . . ." Id. 15. "I really don't know," Chavis responded. "I can't answer that question." Id. 15–16. Unsatisfied and undeterred, Holley's attorney told Chavis that she was "under oath and we need you to be as honest as possible with the question . . . . So again, . . . [d]o you think that . . . since it was a white male who had been hired for this position, *could* that have been a reason why the EEO process was skipped?" Id. 16 (emphasis added). Chavis then speculated that "[i]t *could* have been a factor . . . ." Id. (emphasis added). Chavis's speculative statements are

_____

[6] Chavis testified several times that she did not know why the hiring process was done incorrectly. Any reasons she could provide were merely speculative. E.g., Chavis Dep. 14–16.

far from the resounding condemnation for which Holley cites them.

Even when Chavis finally agreed with counsel's speculation that race could have been a factor in the EEO process initially being skipped, Chavis's purportedly damning statement came with an explanation. Id. Chavis clarified that she was not concerned that the NCDOA's failure to follow the hiring process was racially motivated. Rather, the mistake in Human Resources "was a concern because there was a goal for a black female" to be hired, and because of that goal, Chavis "would like to have seen . . . one of the minorities chosen . . . or at least to be able to have [had] justification" for Lassiter's promotion before Secretary Cobb originally received the packet. Id. 16–17. In short, Chavis would like to have been able to conduct her review before Secretary Cobb initially received the packet. Id. 17. In other words, Chavis's concern was procedural.

Chavis's contemporaneous conversations with various individuals confirms this conclusion. When speaking with Human Resources Director Robinson in the time period between September 19, 2006 and September 20, 2006, Chavis "discussed [only] the procedures and the fact that they had not been followed accordingly, and then the steps that would be involved in the grievance procedure [initiated by non-selected candidates]." Id. 18. Chavis also mentioned the procedural error in a conversation with Mangum. Chavis "contacted him to let him know that [Lassiter's promotion] had not gone through [the proper hiring] process . . . . [She] let [Mangum] know, hey, this is where we are. It did not follow the proper procedures. It did not get the EEO approval. This is one of the concerns that we have . . . ." Id. 20. When Chavis raised these concerns, no one in P&C forced, or tried to force, her to change her stance or to fail to conduct an EEO review. See id. 21, 72–73.

Holley also asserts that "[w]hen Chavis tried to correct the hiring decision to allow EEO review, [Secretary Cobb] and others let the hiring decision stand," despite Chavis's reservations. Pl.'s Mem. Opp'n 17.[7] Again, however, Chavis's deposition demonstrates otherwise. Once the

---

[7] To the extent that Holley implies that Chavis had approval authority or veto power over hiring decisions, she is wrong. As the EEO officer, Chavis performed an advisory role only. She

19

NCDOA realized the error made in Human Resources, it sent the hiring packet to Chavis for EEO review. See Chavis Dep. 69–73. When the packet arrived, Chavis felt uncomfortable signing off on her EEO review at that late date, id. 70, but her discomfort stemmed from the process, not the substance. See id. 69–70, 72–73. Tellingly, when asked directly whether, based on her review of the interview process and on the unanimous ranking of Lassiter first and Sanders second, Chavis had "concerns that discrimination based on race or gender may have occurred," Chavis responded only that she "had a concern that there were . . . under-represent[ed] groups that were in the pool [and that a person from an under-represented group was] not selected." Id. 23; see also Chavis Aff. ¶¶ 6, 8 (swearing that Chavis is "not aware of any discrimination in the hiring process for State Purchase Administrator . . . position #6709," and that Chavis is likewise "not aware of any evidence of discrimination by any member of the interview panel"). Again, Chavis's concerns were wholly procedural. See Chavis Dep. 78–79. On September 20, 2006, Chavis completed her EEO review of Lassiter's promotion. Am. Compl. ¶ 26; Answer ¶ 26; see also Chavis Dep. 69–73. In doing so, Chavis acknowledged that she did not think anyone "was trying to be deceitful" by seeking her EEO review after the promotion decision had been made. Chavis Dep. 72–73. The NCDOA was just seeking to correct a procedural mistake that Human Resources had made. See id. 70–71, 99. After Chavis completed her EEO review, Secretary Cobb did not change the promotion decision. Almost two weeks later, on October 1, 2006, Lassiter's promotion became effective. In sum, even construing the facts in the light most favorable to Holley, no reasonable jury could find that the NCDOA's mistaken process evinced pretext designed to mask race or sex discrimination. See, e.g., DAG Petroleum Suppliers, 268 F. App'x at 242; Snik, 160 F. App'x at 194; Cardoso, 427 F.3d at 435; Dugan, 293 F.3d at 722; Vaughan, 145 F.3d at 203.

---

could review hiring decisions and raise EEO-related concerns. But she had no power to approve, veto, or otherwise "correct" any hiring decisions. See EEO Plan 7, 10–12, 26, 28; Chavis Dep. 11, 24–25, 32, 37–38, 69, 97–98, 112; Robinson Dep. 27, 40–41.

Holley's reference to other "facts" in the record does not salvage her argument. First, Holley contends that Lassiter and Womble approached Sanders, an African-American male applicant for the SPA position, in an attempt to "engage in improper modification of the criteria on which the applicants were considered . . . ." Pl.'s Mem. Opp'n 18. Holley provides no evidence to support her claim. See id. She instead asks the court to infer pretext entirely from the innocuous fact that Lassiter and Womble "asked [Sanders] if he had applied for the SPA position." Id. No reasonable trier of fact can make the requested leap. Holley's argument is wholly conjectural and, as such, does not raise a genuine issue of material fact. See Anderson, 477 U.S. at 249–52; Beale, 769 F.2d at 214. Moreover, the undisputed process by which the NCDOA developed the interview questions and selection criteria belies Holley's speculation. See Stone-Newton Aff. II ¶¶ 6–9.

Second, Holley contends that "Mangum encouraged Lassiter to apply for the SPA Position . . . and was glad that he applied." Pl.'s Mem. Opp'n 19. Holley does not argue that this fact suggests that Mangum pressured Lassiter to apply so that the NCDOA could choose a Caucasian male over an African-American female. Nor could she, for she has no evidence to support that conclusion. Holley in fact makes no argument at all with regard to this alleged fact. See id.

Finally, Holley argues that P&C had a pervasive culture hostile to African-American employees. Id.[8] In support, Holley cites four pieces of evidence. First, she cites deposition testimony that some Caucasian employees socialized with other Caucasian employees and that there were "special cliques" in the P&C workplace. Id. (quotation omitted). Regardless of whether these assertions are true, personal friendships do not support an inference of unlawful discrimination. See

_____

[8] Holley did not include a racially hostile work environment claim in her complaint. Cf. EEOC v. Xerxes Corp., 639 F.3d 658, 668–69 (4th Cir. 2011) (describing elements of a Title VII racially hostile work environment claim). Rather, her race discrimination claim under Title VII is that the NCDOA did not promote her in October 2006 due to her race. She cites an alleged pervasive culture hostile to African-American employees as evidence to support her failure-to-promote claim. The court assumes, without deciding, that such evidence might be probative even though Holley has never alleged, much less presented evidence of, a racially hostile work environment under Title VII.

Dugan, 293 F.3d at 723; Becerra v. Dalton, 94 F.3d 145, 149–50 (4th Cir. 1996); Autry v. N.C. Dep't of Human Res., 820 F.2d 1384, 1385 (4th Cir. 1987); Goostree v. Tenn., 796 F.2d 854, 862 (6th Cir. 1986); Candillo v. N.C. Dep't of Corr., 199 F. Supp. 2d 342, 352 (M.D.N.C. 2002). Without much more, the fact that some Caucasian P&C employees socialize with other Caucasian P&C employees fails to demonstrate any hostility towards African-American P&C employees. See Autry, 820 F.2d at 1385.

Second, Holley cites John Leaston's ("Leaston") affidavit as evidence of a pervasive culture hostile to African-American employees. See Pl.'s Mem. Opp'n 19. Leaston is an African-American man who served as P&C Division Director from 1993 until his retirement in 2003. [D.E. 50], Ex. 9 ("Leaston Aff.") ¶ 5. Before the NCDOA promoted Leaston to P&C Division Director in 1993, Leaston had worked in P&C since 1976. Id. ¶ 4. Leaston opines that "there was a hostile environment toward African American [sic] employees in the Division . . . ." Id. ¶ 9. In support of his opinion, Leaston makes vague, undated references to times when he was employed in P&C and applied for more senior positions, but was denied promotions. Id. ¶ 8. Leaston provides no facts suggesting that the denials were racially motivated. See id. Instead, Leaston nonsensically infers such racial bias from the fact that unidentified "Division managers informed [him] that the successful applicants were better suited." Id. (quotation omitted).

The more specific instances of alleged racial discrimination that Leaston cites are likewise unhelpful to Holley in proving that the NCDOA discriminated against her in October 2006 based on her race. Sworn statements concerning past instances of racial discrimination "may constitute relevant background evidence in a proceeding in which the status of a current [incident] is at issue." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 112 (2002) (quotation omitted). But there are limits to this principle. See id. at 112, 118, 120–21; Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 140–41 (4th Cir. 2007); McDougal-Wilson v. Goodyear Tire and Rubber Co., 427 F. Supp. 2d 595, 616 (E.D.N.C. 2006). Specifically, the court must examine whether the "pre- and post-

22

limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Morgan, 536 U.S. at 120 (quotation omitted) (alteration in original). Leaston's allegations do not meet these requirements. Leaston complains of "name-calling, including the use of racially derogatory terms." Leaston Aff. ¶ 8. He asserts that between 1976 and 1987, unidentified "Division employees acted in an intentional manner to humiliate [him] by making racially derogatory remarks directed toward [him]." Id. These past instances are not sufficiently related to Holley's 2006 non-promotion claim to constitute "part of the same actionable hostile work environment practice . . . ." Morgan, 536 U.S. at 120; compare Duncan v. Manager, Dep't of Safety, 397 F.3d 1300, 1309–10 (10th Cir. 2005), with Rowe v. Hussmann Corp., 381 F.3d 775, 779–82 (8th Cir. 2004). None of Leaston's allegations involved the same actions about which Holley now complains. None of his allegations involved the same individuals about whom Holley now complains. None of the alleged discriminatory acts are temporally proximate to the non-promotion about which Holley now complains. None of the alleged discriminatory acts occurred at all, not to mention with any frequency, after 1987. Past instances of unrelated conduct that occurred approximately twenty years or more before Lassiter was promoted in October 2006 cannot support Holley's claim that she was not promoted in October 2006 due to her race. See Morgan, 536 U.S. at 120–21; Duncan, 397 F.3d at 1309 (holding that actions "taken by different individuals so long ago under different circumstances" cannot "[b]y any reasonable measure . . . [be] part of the same actionable hostile working environment" alleged in the present litigation).

Despite these deficiencies, Leaston opines that his failure to be promoted in the 1980s was due to his race. He then wants to have the court—and a jury—infer from his opinion that the same alleged race discrimination happened to Holley in October 2006. The court will not allow it. Simply put, Leaston's allegations and opinions are not relevant evidence of race discrimination related to Holley's October 2006 non-promotion.

Alternatively, even if Leaston's allegations and opinions were relevant to Holley's October 2006 non-promotion claim, they would be inadmissible at trial under Federal Rule of Evidence 403. Leaston's allegations and opinions concern incidents that occurred approximately twenty years or more before Lassiter's October 2006 promotion, and that are unrelated to the claims that Holley now raises. Their probative value is infinitesimal (at best), and their prejudicial effect is equivalently high. They are likely to confuse or mislead jurors as to the only race discrimination claim in this case—Holley's October 2006 non-promotion. Leaston's allegations and opinions also will waste time and result in a multitude of mini-trials concerning the validity of each promotion that Leaston opines that he did not receive due to his race. Balancing these factors, the allegations and opinions contained in Leaston's affidavit are inadmissible under Rule 403. See Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 380, 383–84 (2008) (holding that so long as a trial court explains the basis of its ruling, it has "wide discretion" under Rule 403 to exclude "testimony by nonparties alleging discrimination at the hands of supervisors of the defendant company who played no role in the adverse employment decision challenged by the plaintiff" (quotation omitted)); cf. PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 125 (4th Cir. 2011) ("[A] district court's decision to admit [or exclude] evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." (quotation omitted)); United States v. Udeozor, 515 F.3d 260, 265 (4th Cir. 2008) ("District judges enjoy wide discretion to determine what evidence is admissible under [Rule 403]."); Garraghty v. Jordan, 830 F.2d 1295, 1298 (4th Cir. 1987); United States v. Penello, 668 F.2d 789, 790 (4th Cir. 1982) (per curiam). Because Leaston's allegations and opinions would not be admissible at trial, the court will not consider them on summary judgment. See Fed. R. Civ. P. 56(c)(4); Evans, 80 F.3d at 962.

Leaston further opines that once he was promoted to P&C Division Director in 1993 and served in that position until retiring in 2003, he created a non-racially-hostile work environment. Leaston Aff. ¶ 12. According to Leaston, however, since his 2003 retirement, "the former

24

environment of race discrimination has been re-created." Id. ¶ 13. Leaston bases this opinion entirely on "conversations with [unnamed P&C] employees . . . ." Id. Such hearsay testimony is not admissible at either summary judgment or trial. See Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 802; Evans, 80 F.3d at 962. Simply put, Leaston's affidavit does not create a genuine issue of material fact as to whether P&C's working environment in October 2006 was hostile toward African-American employees, or whether Holley's non-promotion in October 2006 was due to her race.

Third, Holley cites a conversation between Mangum and Sanders, an African-American male candidate for the SPA position who was not selected. Pl.'s Mem. in Opp'n 10. In that conversation, which occurred after Sanders learned he had not been chosen for the position, Sanders stated that "many in the [P&C] Division felt that there was a glass ceiling for minorities," to which Mangum replied that P&C had "been criticized for just the opposite." [D.E. 50], Ex. 8 ("Sanders Aff.") ¶ 12 (quotation omitted). "Are you saying," Sanders inquired, "that there are too many minorities?" Id. ¶ 13 (quotation omitted). According to Sanders, Mangum nodded affirmatively as to the alleged opinions of unidentified P&C critics. Id.

This conversation cannot bear the evidentiary weight Holley seeks to place on it. As mentioned, Mangum was not the decisionmaker in this case and was not on the interview panel. Moreover, contrary to Holley's argument, the conversation is not probative of the decision at issue in this case concerning Holley.

Fourth, Holley asserts that "Chavis testified that . . . she witnessed [the NCDOA] treat individuals unequally based on race and gender." Pl.'s Mem. Opp'n 10. Holley claims that this evidence shows a pervasive culture of race and gender discrimination within P&C. See id. A review of Chavis's deposition, however, belies Holley's argument. First, Chavis did not actually state that "Caucasians and males were systematically given" better training and advancement opportunities than minorities and women. Id. Rather, Holley's attorney asked Chavis if, during her tenure as an EEO employee at the NCDOA, she felt that "whites or males were systematically given opportunities

25

[at the NCDOA] for training . . . so that they could qualify for certain positions that minorities or women would not be qualified for?" Chavis Dep. 87. In response, Chavis said, "Yes, I do," but was not asked to give any examples or any time-frame. Id. Chavis (who was an EEO officer at the NCDOA from March 20, 2006 to January 3, 2010, Chavis Aff. ¶ 2) was then asked on cross-examination to give examples. She gave only one: a Caucasian woman named Cathy Griner received a trainee position within P&C whereby she learned on the job and was thereby permitted eventually to be reclassified from an administrative assistant job to a purchaser's job. See id. 114–18. Even in the light most favorable to plaintiff, Chavis's deposition testimony does not reflect a pervasive culture of race or gender discrimination in P&C or the NCDOA. For example, when asked to relate instances of race or gender discrimination within the NCDOA, Chavis recalled receiving complaints primarily from employees within facility management, salary administration, the mail service center, and surplus property about alleged mistreatment, including discipline issues and salary issues. See id. 119–29. With regard to employees within P&C, Chavis recalled that a Caucasian female working in P&C complained about perceived unfair treatment, but Chavis could recall only that one, isolated incident. Id. 124–25. Furthermore, Chavis was thrice asked directly whether she remembered any unequal treatment based on race or gender in a hiring or promotion situation within the NCDOA; each time, Chavis responded negatively. See id. 127–29.[9] Thus, Holley's argument fails.

2.

Next, Holley argues that defendant's reasons for hiring Lassiter over her are pretextual, post-hoc rationalizations. Pl.'s Mem. Opp'n 21–25. When asked to justify an employment decision,

_____

[9] Since 1992, the NCDOA has had four people serve as Secretary (a cabinet level position within the Executive branch of the North Carolina state government). Secretary Katie Dorsett (African-American female) served from 1992 to 2001. Secretary Gwynn Swinson (African-American female) served from 2001 to 2006. Secretary Britt Cobb (Caucasian male) served from 2006 to 2010. Secretary Moses Carey (African-American male) has served since 2010. See Holley Dep. I 51; [D.E. 50], Ex. 4 ("Christmas Dep.") 66–67.

an employer may not provide post-hoc rationalizations and claim that they are the actual criteria on which the decision was based. See Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 646–47 & n.2 (4th Cir. 2002). To show that an employer's proffered justifications are post-hoc rationalizations, the plaintiff must demonstrate their falsity. See id. at 646–49. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves, 530 U.S. at 147.

When determining whether a plaintiff has sufficiently demonstrated the falsity of an employer's proffered justifications, courts must recall that an "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." Burdine, 450 U.S. at 259. In making this selection, employers are not limited to requirements specifically enumerated in a job posting or description. See, e.g., Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1130 (4th Cir. 1995); Mallory v. Booth Refrigeration Supply Co., Inc., 882 F.2d 908, 909–11 (4th Cir. 1989); Colon-Sanchez v. Marsh, 733 F.2d 78, 82 (10th Cir. 1984); cf. Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). Employers may instead rely on criteria that are not listed in a job posting but that nonetheless are relevant to the position. See Mallory, 882 F.2d at 909–11; Colon-Sanchez, 733 F.2d at 82. Such criteria may be subjective. Vaughan, 145 F.3d at 204; Amirmokri, 60 F.3d at 1130; Mallory, 882 F.2d at 910. Reliance on subjective criteria can, under certain circumstances, be evidence of pretext, but only when the criteria are "tangential qualities . . . not pertinent to the job . . . ." Ham v. Wash. Suburban Sanitary Comm'n, 158 F. App'x 457, 466 (4th Cir. 2005) (unpublished).

Holley makes three arguments in contending that the NCDOA's proffered justifications for hiring Lassiter are pretextual, post-hoc rationalizations. First, she argues that the NCDOA cites Lassiter's broader purchasing experience, but that during the interview process, the interview panel and other decisionmakers within P&C did not have information on Lassiter's and Holley's comparative work experience. Pl.'s Mem. Opp'n 21. Second, Holley contends that the NCDOA's

27

reliance on Lassiter's superior supervisory experience and training, as well as on his broader purchasing experience, was improper because those criteria were not explicitly stated in either the SPA job announcement or the SPA job description. Id. 22, 24–25. Third, Holley argues that the NCDOA cannot rely on Lassiter's superior interview performance because that criterion is too subjective. Alternatively, she argues that reliance on subjective criteria is evidence of pretext. Id. 22–23. Each of these arguments fails to raise a genuine issue of material fact as to whether the NCDOA's justifications were pretextual, post-hoc rationalizations.

First, Stone-Newton's uncontroverted affidavit states that each candidate provided a full work history to the interview panel, and that each member of the panel had that work history before the candidate's interview. Stone-Newton Aff. II ¶ 8. Thus, Holley's first argument fails to create a genuine issue of material fact as to pretext.

Holley's second argument also fails. The NCDOA admittedly relied on criteria not expressly listed as requirements in the SPA job posting, including supervisory experience and training, and diverse purchasing experience. See Stone-Newton Aff. I ¶ 5. But each of those criteria was germane to the SPA position and implicitly included in the job posting. The first line of the SPA job posting stated that the SPA position is "an administrative and management [one] that functions as the Purchasing Manager that oversees Purchasing Group 2." SPA Job Posting 2. This first sentence clearly indicates that supervisory experience and training would be preferred. Further highlighting the need for strong supervisory skills and training, the job posting next explained that the employee in "[t]his position directs and supervises the activities and operations of this purchasing group," and that "[t]he employee in this position plans, prioritizes, and prescribes the group's processes needed to achieve [its] objectives . . . ." Id. As if these descriptions were not enough to suggest to applicants that supervisory experience and training would be preferred, the job posting made that preference unequivocally clear: the chosen candidate had to have an "[a]bility to supervise and manage people . . . ." Id. When a job posting so strongly indicates that supervisory experience and

28

training would be preferred, Title VII does not require that the job posting expressly list those preferences as selection criteria. See Mallory, 882 F.2d at 909–11; Colon-Sanchez, 733 F.2d at 82; cf. Ham, 158 F. App'x at 466–67.

As for Holley's complaint that the NCDOA relied (in part) on Lassiter's broader purchasing experience, the job posting also suggested that a broad range of purchasing experience would be preferred. The job posting expressly stated that the SPA "functions as the Purchasing Manager that oversees Purchasing Group 2." SPA Job Posting 2. That purchasing group was responsible for contractual and consultant services contracts, commodities contracts, and term contracts. Def.'s Mem. Supp. Mot. Summ. J. 5. Purchasing Group 2 also had a diverse clientele, being responsible for "ensur[ing] delivery of customer satisfaction and adherence to statutory responsibilities to State Agencies, Community Colleges, and Universities." SPA Job Posting 2. By definition, a broad range of purchasing experience would be relevant to a job involving such diverse contracts and clients. That the interview panel considered such experience, therefore, does not violate Title VII or evince pretext. See Mallory, 882 F.2d at 909–11; Colon-Sanchez, 733 F.2d at 82.

Finally, the NCDOA properly considered general interview performance. How someone performs in an interview is admittedly subjective. But such subjective criteria are not per se pretextual. See Torgerson v. City of Rochester, 643 F.3d 1031, 1049 (8th Cir. 2011) (en banc) ("Employers are entitled to compare applicants' performance during interviews."), cert. denied, 132 S. Ct. 513 (2011); Turner v. Pub. Serv. Co. of Colo., 563 F.3d 1136, 1145–46 (10th Cir. 2009) (same); Briggs v. Potter, 463 F.3d 507, 516 (6th Cir. 2006) (same); Vaughan, 145 F.3d at 204; Mallory, 882 F.2d at 910. So long as the criteria are relevant to the job, they may be considered. See, e.g., Amirmokri, 60 F.3d at 1130; Mallory, 882 F.2d at 910–11. Here, general interview performance was relevant to the SPA position. The position necessitated an "[a]bility to . . . manage people through . . . interaction management . . . and leadership." SPA Job Posting 2. More specifically, it "*requires* an individual who is able to interact well and establish effective working

29

relationships with associates, officials and vendors," as well as someone with an "[a]bility to effectively explain purchasing decisions to agency officials, bidders, and the public. [The] position requires an individual who has well-developed interpersonal, communication, managerial, [and] organizational skills . . . ." Id. 2–3 (emphasis added). One of the primary purposes of the live interviews was to measure the applicants' skills in these areas. See Merit Based Recruitment Plan 11. Accordingly, the interview panel properly relied on Lassiter's superior interview performance as a justification for his selection. In sum, Holley has failed to raise a genuine issue of material fact as to whether the NCDOA's proffered justifications for Lassiter's selection were pretextual, post-hoc rationalizations.

3.

Next, Holley argues that she was vastly more qualified than Lassiter. Pl.'s Mem. Opp'n 25–26. If a plaintiff makes a strong showing that she was "discernibly better qualified" than the candidate selected for a promotion, the plaintiff will have successfully raised a genuine issue of material fact as to whether the employer's proffered justifications for hiring the successful applicant are pretextual. See Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 261–62 (4th Cir. 2006). But "[w]hen a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer." Id. at 261.

In support of her argument, Holley first cites her political science degree from Howard University, which she argues is different from and superior to Lassiter's community college course work and experience. Pl.'s Mem. Opp'n 25. She also cites her allegedly superior supervisory experience. See id. 25–26. Finally, Holley argues that she had "more purchasing experience, more years of P&C service, and more years of total supervisory experience." Id. 26.

Holley has not raised a genuine issue of material fact as to whether she was a vastly superior candidate compared to Lassiter. As for Holley's four-year degree, Holley's argument falls short for

two reasons. First, although Holley holds a four-year political science degree, she does not explain how her college course work was any more relevant to the SPA position than was Lassiter's course work and experience. See Holley Dep. I 80. Second, and more importantly, the SPA position does not require a four-year degree. Qualified applicants must have *either* a degree from a four-year university and five years' experience in large-scale purchasing, *or* "an equivalent combination of training and experience." SPA Job Posting 3. Lassiter met the latter criteria. Indeed Lassiter had 150 months of qualifying experience above the minimum education and experience requirements. Such evidence demonstrates that Lassiter was sufficiently qualified for the SPA position and that Holley's educational qualifications were not vastly superior to Lassiter's combination of education, training, and experience.

Nor does Holley's supervisory experience demonstrably exceed Lassiter's. In fact, the opposite is true. For four years, Lassiter managed a procurement office at the N.C. State School of Veterinary Medicine, where he supervised two people. Lassiter Dep. 20. Afterward, Lassiter managed the Office of Purchasing for a physical plant at N.C. State. Id. 21. He worked there for four or five years and managed a team of three purchasers. Id. 21–22. In total, Lassiter had six years and eight months of supervisory experience in purchasing. See [D.E. 51]. Holley concedes that Lassiter had held these supervisory positions before applying for the SPA position, but incredibly argues that her supervisory experience was greater. In support, Holley claims that, early in her career, she was often left in charge of the staff in her office for two hours in the morning because her boss "didn't come to work until like nine-thirty . . . in the morning and the majority of the staff was [there] by seven-thirty." Holley Dep. III 247. In addition to this alleged supervisory experience, Holley claims that she trained two people "on how we do things up here in the Division and everything." Id. And although nobody else in the NCDOA did, Holley considered herself "a manager because of [her experience in] scientific and medical equipment and [because of] the people in the field who . . . did not have that expertise and relied on [her] very heavily." Id. 252.

31

Holley's "supervisory experience" pales in comparison to Lassiter's, and her self-evaluation of her supervisory experience does nothing to alter this conclusion. See, e.g., Evans, 80 F.3d at 960; Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); McDougal-Wilson, 427 F. Supp. 2d at 607. Lassiter had almost seven years of supervisory experience in procurement offices, whereas Holley essentially had none. Indeed, Holley admitted in her deposition that she "had not had any recent supervisory experience . . . ." Holley Dep. I 76. Thus, this argument fails.

Finally, although Holley had certainly worked at P&C longer than had Lassiter, Holley did not have vastly superior purchasing experience when compared to Lassiter. See [D.E. 51]. Lassiter began his career as a Purchasing Agent II for UNC, Lassiter Aff. ¶ 2, before moving to N.C. State to manage the office that "handled all of the purchasing for goods and services for the [university's] College of Veterinary Medicine." Lassiter Dep. 20. He also has three years' experience as an information technology buyer for N.C. State. Id. 20–21. Moreover, when Lassiter managed the Office of Purchasing for the physical plant, he "handled services as well as everything for the physical plant and [information technology] equipment . . . ." Id. 22. Through these jobs, Lassiter gained experience with both commodities and service contracts. As for commodities contracts, Lassiter's experience included "scientific commodities, chemicals, hospital supplies and equipment, and [information technology] equipment." Lassiter Aff. ¶ 2. As for service contracts, Lassiter worked with "environmental cleanup, janitorial supplies, landscape services, hazardous waste material management, blood borne pathogen services, facilities . . . [and] all of the building maintenance facility services for the [N.C. State] Centennial Campus." Lassiter Dep. 22; see also Lassiter Aff. ¶ 2. Finally, starting in 1999, Lassiter worked for P&C as a service purchaser and community college liaison. Lassiter Aff. ¶¶ 3–4.

On the other hand, Holley's experience was limited primarily to purchasing scientific and medical equipment. Holley Dep. I 85. She had some experience with service contracts, but aside from "[doing] some maintenance [contracts]," she could not recall how much or what kind of

32

experience she had. Id. 83–84. Contrary to Holley's arguments, the breadth of Lassiter's purchasing experience far outweighed her own.

In sum, no rational jury could find that Holley's experience and qualifications demonstrably exceeded those of Lassiter. As a result, her pretext argument fails.

4.

Next, Holley argues that the NCDOA has offered inconsistent justifications for hiring Lassiter over her. Pl.'s Mem. Opp'n 26–27. First, Holley cites an explanation that the NCDOA allegedly gave Sanders as to why Lassiter was chosen over Sanders. See id. 27. According to Holley, that explanation differs from the one that the NCDOA now gives for hiring Lassiter over Holley. See id.; cf. Stone-Newton Aff. I ¶ 5. That alleged difference is irrelevant. The only issue here is whether the NCDOA has waivered in its justifications for hiring Lassiter over Holley.

Second, Holley contends that the NCDOA has given her inconsistent reasons for hiring Lassiter over her. Specifically, Holley alleges that "[i]n October 2006 [the NCDOA] sent Holley a letter, providing that another candidate . . . whose education and experience more closely matches the position requirements and organizational needs was selected for the SPA position." Pl.'s Mem. Opp'n 27 (quotation omitted) (omission in original) (emphasis removed). Now, according to Holley, the NCDOA focuses on Lassiter's experience and interview performance. Id. However, Holley has not provided this letter in any of her filings. Without that letter, Holley's statement cannot demonstrate a genuine issue of material fact as to whether the NCDOA's proffered justifications have been consistent. See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . documents . . . or other materials . . . ."); Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."). Thus, this argument fails.

33

Finally, Holley cites the Notice of Cause Determination and argues that it creates a genuine issue of material fact. Pl.'s Mem. Opp'n 27–28. As mentioned, the Notice of Cause Determination found cause to believe that Holley's gender-based claim did not have merit, but that her race and race-sex claims did. Notice of Cause Determination 19.

Notice of cause determinations drafted by the EEOC or comparable state agencies are not particularly probative evaluations of a plaintiff's discrimination claims. See, e.g., Cox v. Babcock & Wilcox Co., 471 F.2d 13, 15 (4th Cir. 1972). Thus, district courts have discretion to exclude such determinations. See id. After all, the judicial process in Title VII involves de novo review in federal court on a complete record. Georator Corp. v. EEOC, 592 F.2d 765, 767 (4th Cir. 1979) ("Even when suit is brought . . . the trial is de novo, and the court will not determine whether substantial evidence supported the Commission's preadjudication finding of reasonable cause."). That "complete record" at trial does not necessarily include the same evidence that was in front of the EEOC or comparable state agency, given that no federal judge has acted as an evidentiary gatekeeper in the agency proceedings. Furthermore, admitting such EEOC or state agency determinations (particularly in a jury trial) leads to extraordinary risks of prejudice, misinterpretation, delay, and waste of time. For these reasons, district courts (both at summary judgment and at trial) have discretion under Federal Rule of Evidence 403 to exclude such agency determinations (whether "cause" or "no cause"). See, e.g., Silverman v. Bd. of Educ., 637 F.3d 729, 732–33 (7th Cir. 2011); Coleman v. Home Depot, Inc., 306 F.3d 1333, 1345–47 (3d Cir. 2002); Paolitto v. John Brown E.&C., Inc., 151 F.3d 60, 64–65 (2d Cir. 1998); Williams v. Nashville Network, 132 F.3d 1123, 1128–29 (6th Cir. 1997) (per curiam); Walker v. NationsBank of Fl. N.A., 53 F.3d 1548, 1554–55 (11th Cir. 1995).

The court has balanced the probative value of the Notice of Cause Determination against the "danger of . . . unfair prejudice, confusi[on of] the issues, [and] misleading the jury . . . ." Fed. R.

Evid. 403. The court also has considered whether admitting the Notice of Cause Determination will produce undue delay and confusion, and will waste time. See id. The court finds that the probative value of the Notice of Cause Determination is substantially outweighed by the "danger . . . of unfair prejudice, confusi[on of] the issues, [and] misleading the jury . . . ." Id. Admitting the Notice of Cause Determination would produce undue delay and confusion, and would waste time. As such, the court would not admit the Notice of Cause Determination at trial and will not consider it at summary judgment. See, e.g., Silverman, 637 F.3d at 732–33. Thus, this argument fails.

In sum, the court has reviewed the record of admissible evidence in the light most favorable to Holley. Holley has failed to raise a genuine issue of material fact as to race discrimination in count I or gender discrimination in count II. Thus, the court grants the NCDOA's motion for summary judgment on those claims.

### III.

Next, the court addresses Holley's retaliation claim. Holley has no direct evidence of retaliation and relies on the same McDonnell Douglas framework. Under McDonnell Douglas, a plaintiff must first establish a prima facie case of retaliation. See, e.g., St. Mary's Honor Ctr., 509 U.S. at 506; Burdine, 450 U.S. at 252–55; Holland, 487 F.3d at 218; Spriggs v. Diamond Auto Glass, 242 F.3d 179, 190 (4th Cir. 2001). Here, the parties initially dispute whether Holley has established a prima facie case. See Def.'s Mem. Supp. Mot. Summ. J. 26–27; Pl.'s Mem. Opp'n 28–29.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in protected activity; (2) her employer took an action against her that a reasonable employee would find materially adverse; and, (3) the employer took the materially adverse employment action because of the protected activity. See, e.g., Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–70 (2006); Holland, 487 F.3d at 218; Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003); Spriggs, 242 F.3d at 190. An adverse employment action includes "a discriminatory act that

35

adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." Holland, 487 F.3d at 219 (quotation omitted) (alteration in original). A plaintiff establishes this element if the complained-of action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68 (quotations omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" are insufficient to sustain a retaliation claim. Id. Title VII is not a civility code and such trivial harms are not materially adverse. Id.

The NCDOA concedes that Holley engaged in protected activity when she filed her discrimination charge in October 2006. See Def.'s Mem. Supp. Mot. Summ. J. 26–27. As for the second element, Holley complains that the NCDOA "scrutinized [her] work product, caused unnecessary delays in approval of [her] projects thereby damaging [her] relationships with her end users and vendors, gave [her] unfair performance evaluations and abused personnel practices by deliberately holding open and not hiring in vacant positions to deny [Holley] employment opportunities." Pl.'s Mem. Opp'n 29. The NCDOA challenges Holley's allegations, contending that those claims fail to demonstrate materially adverse employment action. Specifically, the NCDOA argues that a materially adverse employment action must "include job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Def.'s Mem. Supp. Mot. Summ. J. 26. The NCDOA notes that Holley has not argued that any of these actions occurred, and therefore has failed to establish the second element of her prima facie case. See id. Even if the actions of which Holley complains could constitute adverse employment actions, the NCDOA argues that they are not material because the NCDOA has proffered undisputed explanations for all of them: (1) all Board of Award board sheets were scrutinized, regardless of which employee submitted them; (2) Holley's performance evaluations were consistently positive both before and after Holley complained about her October 2006 non-promotion; and, (3) P&C held vacancies open because the division was under

a de facto hiring freeze. See Def.'s Reply 9–10. The NCDOA asserts that these explanations refute Holley's allegations, and that Holley has consequently failed to demonstrate that the alleged retaliatory acts were materially adverse.

Holley has failed to raise a genuine issue of material fact that as to whether the NCDOA took any action against her that a reasonable employee would find materially adverse. First, allegedly heightened scrutiny of an employee's work product, without more, does not constitute a materially adverse employment action. See, e.g., Belton v. City of Charlotte, 175 F. App'x 641, 658 (4th Cir. 2006) (per curiam) (unpublished); cf. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 407 (4th Cir. 2005). Even if such heightened scrutiny could be materially adverse, it was not in this case. Holley can recall only one specific incident in which her work was scrutinized. See Holley Dep. II 101–05, 109.[10] In that incident, Holley alleges that her supervisor, Staton, questioned her on whether DNA-testing equipment she was working to purchase was manufactured and distributed only by the patent holder. Id. Assuming that is true,[11] Staton did not question Holley's judgment in retaliation for her protected activity. He did so because a member of the Board of Award—a body charged with approving certain state purchasing contracts—had asked him to do more research and to determine if the state could negotiate a better price. Staton Dep. III 62. In turn, Staton asked Holley to investigate the issue. Although Staton's directive may have been annoying, it falls well short of conduct that would dissuade a reasonable worker from engaging in protected activity. As such,

---

[10] Holley makes some generalized references to times when she felt her work was overly scrutinized, including an undated instance in which "Senator Garwood [came] back to [her] office one day after [a session before the Board of Award] . . . and said, 'They tried to get you on Board today, but you were ready for them.'" Holley Dep. II 107; see id. 101–20. Those vague references lack specificity and, in any event, do not demonstrate the type of materially adverse employment action necessary to sustain a Title VII retaliation claim. See, e.g., Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68; James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004). Accordingly, they do not help establish Holley's prima facie case.

[11] Staton testified that he questioned Holley on the price, not on whether the equipment could be purchased from another source. See Staton Dep. III 62.

Staton's allegedly heightened scrutiny was not materially adverse. See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68; Holland, 487 F.3d at 219.

In addition to this specific incident, Holley complains generally of inconsistent reviews of her board sheets. See Holley Dep. II 105. She claims that one week, her board sheets would be approved without question, and then the next week, she would be told "[t]his is wrong" and would be asked to correct errors in her board sheets. Id. 105–06 (quotation omitted). Such vague references carry little weight. See James, 368 F.3d at 377. In any event, the actions amount to nothing more than minor inconveniences.

As for Holley's allegations of unnecessary delays in approving her work and consequent damage to her relationships with end users and vendors, Holley cites only an incident involving DNA-testing equipment. See Holley Dep. II 102–20. Holley opines that Staton held her bid on the equipment to harass her. See id. 102–03. But Staton's deposition explains the situation more fully. The Board of Award was concerned that the state would be spending too much money on the DNA-testing equipment, and asked Staton to negotiate a better price. Staton then delegated that task to Holley and Westbrook. Staton Dep. III 62, 65–67. That process may have taken several months, but the request for further research and negotiation was routine. See id.

That routine delay did not damage Holley's relationship with the SBI. In arguing to the contrary, Holley torpedoes her own position. Rather than take the blame when the SBI levied "an awful lot of pressure" on her, Holley told the SBI that the decision was out of her hands. Holley Dep. II 103. She deflected the SBI's frustration to Staton, telling the SBI that it was "going to have to talk to [Staton] . . . because [Holley did not] even have the folder and [she could not] tell [the SBI] when [the bid was] going to be approved . . . . " Id. (quotation omitted). Thereafter, in fact, the SBI "got on [Staton]." Id. This testimony hardly demonstrates that the routine delay damaged Holley's relationship with the SBI.

Holley also has not demonstrated that the delay in purchasing the DNA-testing equipment damaged her relationship with the vendor. She notes that the vendor began "calling and wanting to know what's happened" to the bid. Id. But such evidence, alone, is not probative of material adversity. Such benign inquiries, although perhaps annoying, are not materially adverse. See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68.

Third, Holley has not received unfair performance evaluations. Since 2004, Holley has consistently received high marks. Ratings of her individual skills have oscillated between good, very good, and outstanding. Performance Evaluations 2–6, 11–15, 20–24, 29–33, 38–42, 47–52. Her overall rating has always been very good. Id. 9, 18, 27, 36, 45, 55. Such evaluations are hardly unfair, much less materially adverse. See, e.g., Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68; James, 368 F.3d at 377–78; Santa Cruz v. Snow, 402 F. Supp. 2d 113, 126 (D.D.C. 2005).

Finally, Holley has failed to demonstrate that the NCDOA denied her any employment opportunities by refusing to hire for vacant positions. Since joining P&C, Holley has applied for only three positions. Holley Dep. II 133. The first was the SPA position filled by Staton in 2004. The second was the SPA position filled by Westbrook in 2005. The third was the SPA position filled by Lassiter in October 2006. See id. 128. Holley has provided no evidence that she applied for a vacancy that was simply held open.

Alternatively, even if she was not required to apply for a position that was vacant (a dubious proposition given the prima facie elements of a Title VII failure-to-promote claim),[12] her argument still fails. First, Staton has provided uncontroverted testimony that vacant positions were not filled because of budget constraints and because P&C was considering a reorganization that might have eliminated some or all of those positions. Def.'s Mem. Supp. Mot. Summ. J., Ex. 7 ("Staton Dep. I") 73–74, 95–96. The result was a de facto hiring freeze. See id. Second, Holley's only evidence

---

[12] See Diamond, 416 F.3d at 319 n.6 (noting that a plaintiff must apply for the position in question to establish a prima facie case).

that the vacancies were held open in retaliation is her speculation that she "would have been the most qualified candidate and [that the NCDOA] would do anything . . . not to give [her] a job." Holley Dep. II 114. Holley's opinion of her own abilities, however, does not create a genuine issue of material fact as to materially adverse employment actions. See, e.g., Evans, 80 F.3d at 960; Smith, 618 F.2d at 1067; McDougal-Wilson, 427 F. Supp. 2d at 607. Nor does her speculation about the NCDOA's behavior.

In sum, Holley has failed to meet the second element of her prima facie retaliation claim. Thus, the court grants the NCDOA's motion for summary judgment as to count III.

IV.

No rational jury could find that the NCDOA failed to promote Holley in October 2006 due to her race or gender. Likewise, no rational jury could find that the NCDOA retaliated against Holley following her complaint concerning her October 2006 non-promotion. Accordingly, the court GRANTS the NCDOA's motion for summary judgment [D.E. 41] on Holley's race- and gender-based discrimination and retaliation claims. The clerk is DIRECTED to close this case.

SO ORDERED. This _10_ day of February 2012.

JAMES C. DEVER III
Chief United States District Judge

40